Filed 12/20/21  In re P.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. S.P., Defendant and Appellant. | E077054 (Super.Ct.Nos. J279275 & J279782 & J279783) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, Svetlana Kauper, Deputy County Counsel for Plaintiff and Respondent.

1

S.P. (Mother) appeals the termination of her parental rights to P.H., S.G., and A.D. (collectively, Minors) at a Welfare and Institutions Code section 366.26[1] hearing. Mother contends the juvenile court erred by failing to properly apply the factors in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) in finding that the beneficial parental bond relationship exception of section 366.26, subdivision (c)(1)(B)(i) did not apply and terminating Mother's parental rights.

## FACTUAL AND PROCEDURAL HISTORY

### A. INITIAL DETENTION OF P.H.

This family first came to the attention of San Bernardino County Children and Family Services (the Department) on December 31, 2018; it filed a section 300 petition for P.H. against Mother and H-Father, (H-Father) who was the father of P.H., on January 3, 2019. P.H. was 10 years old at the time.

According to the detention report, on December 31, 2018, H-Father was arrested for driving under the influence while P.H. was in the car. P.H. reported to the social worker that he had observed H-Father and H-Father's girlfriend drink from a "little" bottle and a "big" bottle. H-Father and the girlfriend then decided to drive to the home of the paternal uncle. P.H. reported he had observed H-Father and his girlfriend engage in domestic violence. H-Father admitted to driving drunk but denied that he and his girlfriend engaged in domestic violence.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Mother and P.H. reported that P.H. had lived with H-Father since his birth because of Mother's living situation. P.H. visited Mother on weekends. Mother denied any substance use. Mother had four children living with her, including S.G. and A.D.

On January 2, 2019, P.H. was asked if he wanted to be placed with Mother. P.H. reported he did not want to live with Mother because she did not take care of him. P.H. cried and reported he did not want to leave his siblings but did not want to live with Mother. The Department determined that at the time there was no need to file additional petitions for S.G. and A.D. Both Mother and H-Father had prior involvement with the Department and had criminal histories.

The section 300 petition alleged against H-Father that there was a failure to protect pursuant to section 300, subdivision (b), in that he exposed P.H. to domestic violence; and he had a substance abuse problem, which put P.H. at risk of abuse or neglect. It was alleged against Mother pursuant to section 300, subdivision (b), that she failed to protect P.H. by leaving him in the care of H-Father when she knew or should of known that there was a risk of neglect or abuse. P.H. was detained with a relative but it was recommended that he be placed with Mother. H-Father and Mother shared legal custody of P.H. but Father had sole physical custody.

The detention hearing for P.H. was held on January 4, 2019. Only Mother was present. The Department requested that Mother drug test and the trial court ordered that Mother test that day. A prima facie case was established that P.H. came within section 300, subdivision (b). P.H. was placed in Mother's custody.

### B.     P.H.'S AMENDED PETITION AND SIBLING PETITIONS

An amended section 300 petition was filed for P.H. on February 4, 2019 (amended petition). P.H. had been detained from Mother and H-Father. The amended petition added the additional allegation against Mother that she suffered from untreated substance abuse, which put P.H. at risk of harm. Mother had tested positive for marijuana and methamphetamine on January 28, 2019, after missing three prior tests. P.H. was placed in the foster home of Ms. R. The detention hearing on the amended petition was conducted on February 5, 2019. A prima facie case was found and P.H. was to remain detained in the foster home of Ms. R.

Section 300 petitions were filed for P.H.'s siblings, A.D. and S.G. (sibling petitions). A.D. was five years old and S.G. was 12 years old. A.D.'s father was A.D. Sr. (D-Father) and S's father was J.G. (G-Father). The sibling petitions alleged pursuant to section 300, subdivision (b), that Mother suffered from untreated substance abuse issues, which placed her children at substantial risk of harm and/or neglect; and pursuant to subdivision (g), that there was an open case involving P.H. for failure to protect and substance abuse.

According to the detention report for A.D. and S.G., Mother tested positive for marijuana and methamphetamine and missed a test on February 11, 2019. A.D. and S.G. were detained on February 11, 2019, and placed in the foster home of Ms. V.[2] The

---

[2] The detention report also named two other children, St.G. and J.G. belonging to Mother who are not subjects of the instant appeal because they were placed in a legal guardianship.

4

detention hearing on the sibling petitions was held on February 15, 2019. A prima facie case pursuant to section 300, subdivisions (b) and (g) was found, and A.D. and S.G. remained detained with Ms. V.

C.     JURISDICTION/DISPOSITION REPORTS

A jurisdiction/disposition report was filed on January 23, 2019, for the section 300 petition filed for P.H., prior to the filing of the amended and sibling petitions. The report provided that Mother failed to drug test on January 4, 2019, as ordered by the juvenile court, and she was late to her test on January 14, 2019, which was negative. She failed to test on January 22, 2019, claiming that the juvenile court stated she did not have to test. It was reported that Mother tried to send someone else to take her January 4 drug test. P.H. was still in Mother's custody.

In June 2018, P.H. was staying with Mother and was found walking on the highway. He reported he left his Mother's residence because he "does not like her." He was taken to live with H-Father.

Mother insisted that H-Father had custody of P.H. because he had threatened her not to try to get custody. She also claimed that she took P.H. to a visit with H-Father and he never returned him to her custody. Mother reported P.H. was having a hard time adjusting to her home. Between 2012 and 2018 there had been several reports regarding Mother and her home. It was reported Mother had numerous people living in her home and that she used methamphetamine and marijuana in the presence of the children who lived with her.

5

After the amended and sibling petitions were filed, the Department filed an amended jurisdiction/disposition report. The Department recommended that the allegations in the sibling petitions be found true and that reunification services be provided to Mother. A.D. and S.G. had been moved to the foster home of Ms. B. to be closer to P.H. for sibling visits. Mother had admitted that she had a substance abuse problem and wanted help. She was referred to an outpatient drug treatment program. She had two negative drug tests on February 15, 2019, and March 4, 2019. She tested positive for Ethanol on February 22, 2019.

S.G. suffered from cerebral palsy and asthma. He was speech impaired and developmentally delayed. He required special education.

Additional information was provided to the juvenile court on April 12, 2019. P.H. remained placed with Ms. R. He was doing well at school and was making friends. He was placed in advanced classes. Mother had started the outpatient treatment program and had a negative drug test on March 27, 2019. Mother had been regularly visiting with Minors. It was recommended that Mother be granted reunification services.

The jurisdiction/disposition hearing on the amended petition was conducted on April 15, 2019. Mother was not present in court. H-Father was named the presumed father. Mother was granted reunification services. The allegations in the amended petition were found true.

The jurisdiction/disposition hearing for A.D. and S.G. was heard on April 17, 2019. Mother denied the allegations and testified that "I haven't smoked no meth. . . . I don't smoke marijuana." She insisted the allegations against her were false. She disputed that she had a positive test on January 31, 2019, and denied she sent someone else to test for her. She did not drink alcohol so she could not have tested positive for alcohol on February 22, 2019. The trial court ordered A.D. and S.G. remain in the foster home of Ms. B. The allegations for A.D. and S.G. in the sibling petitions were found true. Mother was granted reunification services.

D.    REVIEW REPORTS AND HEARINGS FOR MINORS

A six-month status review report for Minors was filed on October 4, 2019. It was recommended that Mother continue to receive reunifications services. A.D. and S.G. were placed in the home of Mr. and Mrs. R. on August 18, 2019; P.H. was placed with Mrs. A. on July 8, 2019. No relatives were willing to take placement.

Mother had attended every visit with Minors. S.G. (age 13) had delayed development and presented as a seven year old. He was receiving help in school. He also was receiving therapeutic services. P.H. was participating in therapy and was doing well in school. A.D. was developing normally.

The Department noted that Mother had made substantial progress in her case plan. Mother completed her parenting classes and was still participating in substance abuse treatment. She had missed some drug tests but also had negative results. Mother had completed therapy. Mother had visits two hours each week with Minors. The Minors enjoyed their time with Mother. They all visited with Mother at the same time. Minors

7

had built a relationship with Mother. There was more communication and understanding between Minors and Mother. The Department recommended four hour unsupervised visits each week. The permanent plan, if Mother was able to find housing and continued to remain sober, was to return Minors to her care.

At the six-month review hearing for Minors, Mother's reunification services were continued. Mother also was granted weekly, four-hour unsupervised visits with Minors.

A 12-month review report was filed on February 11, 2020. It was recommended that Mother's reunification services be continued. A.D. and S.G. had been in the home of Mr. and Mrs. R. since August 2019; P.H. moved into the home on December 17, 2019. Mother was living with maternal grandfather; Minors could not be placed in that home as maternal grandfather had a criminal history. Mother was working and saving money to get housing. Mother had completed her outpatient drug treatment. Mother had missed four drug tests in January and February 2020. Mother had completed therapy and parenting classes.

S.G. had a seizure. S.G. had trouble communicating but his school was working with him. P.H. was caring and worried about A.D. and S.G. He was taking advanced classes and doing well at school. P.H. was attending therapy with Mother. A.D. had no developmental delays and was participating in counseling.

Mother regularly attended visits with Minors and Minors "seem to be enjoying their time with her." The Department described the visits as "okay." On January 15, 2020, Mother took A.D. to the store and left P.H. and S.G. with maternal grandfather and maternal aunt. While Mother was gone, maternal aunt's boyfriend ran into the home

8

because he was being chased by the police. He barricaded himself in the house with P.H. and S.G. Mother was admonished she should not leave Minors alone with maternal grandfather or maternal aunt. On January 26, 2020, Mother again took Minors to maternal grandfather's house. During visits, Mother tried to bring fun activities to bond with Minors. Minors reported that they had seen a change in Mother and wanted to go back home with her. Once Mother obtained housing, the Department recommended that Minors be returned to Mother's care under a family maintenance plan.

The 12-month review hearing was held on February 19, 2020. Mother's reunification services were continued.

The 18-month review report was filed on July 7, 2020. The Department was recommending that Mother's reunification services be terminated and that a section 366.26 hearing be set for Minors. Minors were still placed with Mr. and Mrs. R.

Mother was having a hard time staying clean and sober. She had been testing positive when tested by her outpatient program. A.D. was developing normally and would be attending first grade. P.H. had some anxiety and still attended therapy with Mother. S.G. continued to have seizures but his caregivers properly cared for him. His speech had declined due to the seizures. S.G. had a strong bond with his caregivers. P.H. had bonded with the foster family.

Mother tested positive for methamphetamine two weeks in a row in April 2020. Her outpatient drug treatment center was recommending that Mother attend a three month inpatient treatment program. Mother admitted she had a drug problem but insisted she

9

was not using despite the positive tests. Since May 19, 2020, Mother had three no-show drug tests.

P.H. and Mother attended therapy together in order to create a familial bond. P.H. had lived with H-Father for the majority of his life. P.H. was not bonding to Mother. He did not feel a connection to her. P.H. had told the foster mother that if he was returned to Mother he would just run away because no one would be taking care of him. The therapist reported the sessions were going well but P.H. had trouble opening up.

Mother had been having overnight visits with Minors in a hotel room, but once she tested positive for methamphetamine, overnight visits were stopped. S.G. and A.D. enjoyed their visits. P.H. expressed that he no longer wanted to attend the visits. P.H. reported that Mother had been giving marijuana to St.G. and J.G. during the overnight visits. He told the social worker he did not want to return to Mother's care because no one would care for him. S.G. and A.D. reported having a good time with Mother. They liked the food she provided to them. They did not report any drug use.

P.H. wanted to be adopted. The foster mother was willing to facilitate contact between Minors and their parents after the adoption. The social worker was unable to talk to A.D. because of his age, and could not talk to S.G. because of his developmental delays. The foster mother had spoken with them but they did not seem to completely understand the meaning of adoption. The Department recommended that visitation with Mother and Minors be reduced to two hours each week and that the visits be supervised. The matter was set contested by Mother.

10

Additional information was provided to the juvenile court on October 30, 2020. Mother had missed nine drug tests in the prior six months. She had positive tests in April and May 2020. She then stopped going to the drug tests. Mother reported being interested in enrolling in a drug treatment program. Mother was referred but never enrolled. A.D. and S.G. attended four-hour visits remotely with Mother and liked to attend the visits. P.H. did not participate. The Department was still recommending that visits be reduced to two hours and be supervised.

The 18-month review hearing was held on November 3, 2020. Mother presented no evidence and submitted on the reports. She objected to the termination of reunification services. The juvenile court found that reasonable services had been provided to Mother and there was no substantial likelihood Minors would be returned to her care. The matter was set for a section 366.26 hearing. Mother's counsel requested a bonding study. Counsel was advised that he had to file a written request for the bonding study if Mother wanted the juvenile court to pay for the study. Counsel then stated that Mother may be able to pay for the study. The Department objected. The juvenile court ordered that Mother could obtain a bonding expert and the Department was ordered to accommodate the expert to attend visitation.[3] Mother's visits with Minors were reduced to two hours each week.

---

[3] It appears that a bonding expert was never hired by Mother nor requested by counsel to be paid by the juvenile court.

11

E.     SECTION 366.26 REPORT

The section 366.26 report for Minors was filed on February 22, 2021. It was recommended by the Department that Mother's parental rights be terminated and that Minors be freed for adoption by the foster family, Mr. and Mrs. R. P.H. was 12 years old; S.G. was 14 years old; and A.D. was 7 years old.

S.G. was seen by a neurologist and diagnosed with epilepsy and was receiving treatment. S.G. continued to receive special needs services. A.D. and S.G. were developmentally on target. The foster family was committed to adoption and wanted to provide Minors with a permanent home. The foster family had a strong bond with Minors. A.D. and P.H. stated they wanted to be adopted by Mr. and Mrs. R. S.G. did not understand.

Mother had supervised virtual visits with Minors one time each week for two hours. On March 17, 2021, a visit between Mother and Minors was monitored. P.H. did not attend the visit. After 30 minutes, A.D. left the visit and S.G. went with A.D. S.G., A.D. and P.H. were interviewed on March 30, 2021. P.H. did not want to visit with Mother. P.H. reported he had no relationship or connection with Mother. P.H. felt safe in the foster home. A.D. reported that visits with Mother were "good" but did not last very long. He said the visits were boring. S.G. could not express how he felt about the visits but did say he loved Mother.

The foster mother reported that visits between Mother and Minors usually ended early. When the visits ended, Minors told their Mother goodbye and then would go play; there was no reaction. The social worker spoke with Mother on April 24, 2021. She

12

acknowledged A.D. and S.G. would end the visits early and that P.H. had not visited in a long time. A.D. and S.G. would tell her they wanted to go play and would end the visit.

The Department contended termination of parental rights would not be detrimental to Minors. The matter was set contested.

F.     SECTION 366.26 HEARING

The section 366.26 hearing was held on April 23, 2021. Mother testified. She had maintained regular visitation with A.D. and S.G. She had virtual and in-person visits. During the visits, she would work with S.G. and A.D. on their schoolwork. She would bring them both food to the in-person visits. S.G. told her during visits that he missed her and loved her. Mother insisted that S.G. wanted to come home with her. A.D. told her that he missed her and loved her. She was close to A.D. and S.G. She indicated at the last few visits, A.D. and S.G. had left the visits early so she was thinking they were changing. The visits only lasted for about 10 minutes. S.G. had cried one time during a visit saying he missed her. Mother believed it would be detrimental to terminate her parental rights based on the tight bond she had with A.D. and S.G.

Mother was asking for a lesser placement of legal guardianship. She admitted she did not have a close relationship with P.H.

The Department contended that Mother had not met her burden of establishing the parental bond exception. Contrary to Mother's testimony, according to the reports, A.D. and S.G. had no reaction when visits ended. There were no reports of A.D. and S.G. crying at the end of visits; they ended the visits early. P.H. and Mother had no

13

relationship. Mother did not have a parental role with Minors. She was simply a visitor to them. Further, A.D. and P.H. had expressed wanting to be adopted.

Mother's counsel contended that Mother had maintained consistent visitation. Mother had been the main parent of S.G., who was now 15 years old, and A.D., who was 7 years old, except for the prior two years. S.G. expressed that he loved Mother. Mother brought snacks to visits and did homework with A.D. and S.G. The quality of the bond was so strong that it outweighed the security of adoption.

Minors' counsel contended that the bond between Mother, and A.D. and S.G., was not as strong as she believed. They both had not wanted to participate in visits with Mother. Minors were happy in the adoptive home. It was not in the best interests of Minors to continue Mother's parental rights.

The trial court ruled, "So the Court has read and considered the evidence, as well as heard Mother's testimony. So as everybody knows, there are a couple of prongs here for the mother who has the burden in this case, and I will find clear and convincing evidence of general and specific adoptability for [A.D.] and [P.H.] and [S.G.]. I'll find by clear and convincing evidence of specific adoptability, and that the adoptive home is appropriate. [¶] The burden now shifts to the mother to prove by preponderance of the evidence that the bond exception should take place. So the first prong is regular visitation and contact. For [A.D.] and [S.G.] that prong is met. For , [P.H.] that prong is not met. So she is done on that. Okay? [¶] And, then, for [A.D.] and [S.G.], proceeding to prong two. The parent must establish that the benefit of maintaining the parent-child relationship outweighs the benefits of adoption. One of the requirements under that is

14

that the parent must occupy a parental role. There is no doubt that at some point in the children's lives she maintained a parental role and occupied that role, but the Court sees no evidence of that parental role having extended during the course of the dependency case. [¶] So at one time in their lives she did occupy a parental role. She has not occupied a parental role in two years, and the attempts by her have really not amounted to more than what we would classify as a loving relative visitor, friendly visitor as it were. Although, obviously, the children talk about love and loving her and things like that, the Court has to weigh that on balance with the overall benefits to the child. And furthermore, Mother would have to show that termination of parental rights is actually detrimental to those kids." The juvenile court concluded, "The Court weighing all these circumstances, I'll find that the benefits of adoption do outweigh the benefits of maintaining the parent-child relationship."

The juvenile court terminated Mother's parental rights and freed P.H., S.G. and A.D. for adoption.

## DISCUSSION

Mother claims she has a significant bond with Minors and that the juvenile court erred by failing to apply the parental bond exception of section 366.26, subdivision (c)(1)(B)(i). She insists that in making its determination, it applied the wrong legal standard by not having the benefit of the recent California Supreme Court case of *Caden C.*, *supra*, 11 Cal.5th 614 in determining whether the exception applied.

" 'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) After reunification services are denied or terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*Ibid*.) Adoption is preferred once reunification services have been terminated. (*Id.* at p. 53.)

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds "by clear and convincing evidence" it is likely the child will be adopted. There are several statutory exceptions. Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." A beneficial relationship is established if it " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re Brandon C*. (1999) 71 Cal.App.4th 1530, 1534.)

Our Supreme Court recently clarified the proper application of the parental bond exception. It granted review, "to clarify the applicability of the parental-benefit exception—in particular, whether a parent must show progress in addressing issues such as drug abuse that led to the child's dependency in order to establish the exception—and

16

to resolve the standard of review for decisions regarding the parental-benefit exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 629, fn. omitted.)

The court provided an overview of the elements for applying the exception. "[T]he parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

17

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

The California Supreme Court also held that "courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Moreover, "we reject . . . that the exception can only apply when the parent has made sufficient progress in addressing the problems that led to dependency. Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id*. at p. 637, fn. omitted.)

The California Supreme Court concluded a "subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent

18

is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

The California Supreme Court also clarified the standard of review. In reviewing the finding on appeal, "a substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) As for the third element, whether termination of parental rights would be detrimental to the child, we review the finding for abuse of discretion. (*Id.* at pp. 640-641.)

The California Supreme Court did not change the legal standard of the parental bond exception. Rather it clarified the process that the juvenile court should use in evaluating the exception and did not change the elements of the exception. As stated, the court granted review to "clarify" the parental bond exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) Further, it concluded that consideration of a parent's failure to complete his or her reunification services was an inappropriate factor and clarified the standard of review on appeal.

Here, even though the trial court did not have the benefit of *Caden C.*, it properly evaluated the parental bond exception. The trial court did not consider Mother's failure to maintain her sobriety or progress in her case plan in determining whether the exception

19

applied. It further did not consider whether she could provide a proper home for A.D., S.G. and P.H. The juvenile court did not consider those factors found improper in *Caden C.*

Instead, the juvenile court focused on the factors of the parental bond exception. First, it found that Mother had maintained consistent visitation with A.D. and S.G. However, it found that she had not met this first prong in regard to P.H. There was not consistent visitation because P.H. refused to visit with Mother. Substantial evidence supports the juvenile court's finding as to P.H. P.H. reported he had no meaningful relationship with Mother and he did not want to visit with her. Mother testified at the section 366.26 hearing that she had not visited with P.H. for a "long time." The juvenile court properly found as to P.H. that Mother had not maintained consistent visitation with P.H. so the exception did not apply.

The juvenile court then turned to Mother's relationship with A.D. and S.G. This element includes reviewing factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The juvenile court recognized that Mother occupied a parental role with A.D. and S.G. until the dependency proceedings as A.D. had lived with her until he was seven year old, and S.G. had lived with her until he was 12 years old. However, as the dependency proceedings progressed, the relationship had turned to more of a friendship. A.D. and S.G. wanted to be with Mother in February 2020, but by March 2021, they ended visits early and A.D. wanted to be adopted. Although A.D. and S.G.

20

expressed they loved Mother (based solely on Mother's testimony) they began ending visits early. Additionally, the visits with Mother were not always positive. P.H. reported that Mother had been providing marijuana to St.G. and J.G. during visits. Further, Mother had left S.G. and P.H. alone with maternal grandfather, and they were involved in a barricaded suspect event with police. Although Minors had a good time with Mother, it was not shown that there was particularly strong, parental bond between Mother, and A.D. and S.G.

Finally, as to the third element, Mother did not present any evidence that A.D. and S.G. would be greatly harmed by severance of the parental relationship, or that the relationship outweighed the security and stability of their new, adoptive home. Minors' counsel stated that A.D. and S.G. had expressed they no longer wanted to attend visits with Mother. A.D. wanted to be adopted by Mr. and Mrs. R., with whom he had lived for almost two years. The foster mother reported that there was no reaction by A.D. and S.G. when the visits with Mother ended. They did not cry or express any emotion. The only evidence that there was a particularly strong bond between Mother, and A.D. and S.G., was her own testimony. However, even Mother testified that their relationship was changing. None of the reports reflected a strong bond between A.D. and S.G., and Mother. They instead reflected that Minors had a "good time" at visits but they would not be devasted by the severing of the parental relationship. The juvenile court did not abuse its discretion by finding that the termination of Mother's parental rights would not be detrimental to A.D. and S.G.

21

Mother relies on *In re B.D.* (2021) 66 Cal.App.5th 1218 to support her claim that remand for the juvenile court to consider *Caden C.* is necessary. Mother claims, like in *B.D.*, the juvenile court did not have the benefit of the guidance of *Caden C.* since it was decided after the section 366.26 hearing. However, in *B.D.*, the juvenile court in determining whether the parental bond exception applied, stated that "the parents' substance abuse, and the impact this had on their ability to safely parent their children, to be their 'core issue.' " (*B.D.*, at p. 734.) The appellate court found that the juvenile court improperly considered the parents had not completed their reunification services in determining whether the parental bond exception applied. It concluded that since the court in *Caden C.* determined that these were inappropriate factors to consider in determining whether the parental benefit exception applied, the *B.D.* court remanded the case for reconsideration by the juvenile court. (*B.D.*, at p. 735-738)

In this case, the juvenile court did not take into account any inappropriate factors in determining the parental bond exception did not apply. Rather, it only considered the bond between Mother and A.D. and S.G., and whether terminating that relationship would be detrimental to the children even when balanced against the countervailing benefit of a new, adoptive home. Remand is unnecessary in this case.

Substantial evidence supports that Mother maintained consistent visitation with A.D. and S.G. However, there was not sufficient evidence that Mother had a significant bond with A.D. and S.G. The trial court did not abuse its discretion by determining termination of their relationship would not be detrimental to Minors when balanced against the countervailing benefit of a new, adoptive home.

## DISPOSITION

The juvenile court's order terminating Mother's parental rights and freeing P.H., S.G. and A.D. for adoption is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.